OPINION
{¶ 1} Laron Nooks appeals from a judgment of the Juvenile Division of the Montgomery County Court of Common Pleas, which adjudged him to be a delinquent child by reason of rape and which committed him to the Department of Youth Services for a minimum term of one year and a maximum term not to exceed Nooks' attainment of twenty-one years of age.
 {¶ 2} The state's case established the following facts.
 {¶ 3} On February 11, 2002, Nooks and the victim in this case, who were fourteen and thirteen years old respectively, attended a wood shop class at Wilbur Wright Middle School in Dayton. The class ended at approximately 10:23 a.m. The victim testified that, following the class, she had proceeded to a stairwell located near the classroom, which she had customarily taken to her next class. Upon reaching the stairwell, she stopped to tuck in her shirt and asked Nooks to hold her books while she did so. She then began walking up the stairs to her next class.
 {¶ 4} As the victim was climbing the stairs, Nooks stepped in front of her and asked her to kiss him. When she refused and attempted to continue up the stairs, he trapped her against the stair rail by putting one arm on either side of her and attempted to kiss her. The victim resisted by moving her face away and told Nooks to "get away" or to "stop playing." At this time, the two were seen by another student, who testified that he had seen Nooks with the victim trapped on the stairs and had heard her say, "Stop. Leave me alone."
 {¶ 5} The victim then attempted to get away, moving down the steps and pushing Nooks' arm away from the rail. She almost tripped and dropped her books, and Nooks helped her up while she picked up her books. As he was helping her up, Nooks pushed the victim under the stairs and shoved her against the wall. The victim testified that he had been giggling and that she had told him to "stop playing games." Nooks then attempted to put his hand into her pants, but she crouched forward to prevent him from doing so. Nooks moved so that he was behind the victim, with his arm around her waist, and pulled against her stomach with his arm, causing her to fall forward onto her knees. She rolled over onto her back and partially sat up. When she had pulled herself up so that she was kneeling against the wall, Nooks succeeded in getting his hand into her pants and put his fingers inside her vagina. The victim yelled for Nooks to stop, scratched and pinched his arm and tried to pull his hand out. She did not actually yell for help because she did not want to be embarrassed by other people coming into the hallway and seeing her. Although she thought that the teacher from her wood shop class, Mr. White, might hear her screaming, no one came out into the hallway to help her.
 {¶ 6} Nooks eventually removed his hand from the victim's pants when he almost fell from his kneeling position. He attempted to put his hand inside her pants again, but she tried to get away and he was unable to do so. He then straddled himself across her waist and tried to pull her pants down. The victim testified that Nooks had said that he "was going to make a big hole in [her] lower area." She tried to hit him in the groin with her knee, but he did not stop. Somehow, the victim got away from Nooks, but he came up behind her and began choking her. She testified that he had said that "he could bang [her] head against a door and make [her] unconscious, finish and leave." Nooks then suddenly let her go and apologized, asking if they were still friends. She did not answer, instead telling him that she was going to Mr. White's classroom. She knocked on the door but received no answer. She then told Nooks that she was going to report the incident, to which he replied that he knew people who could hurt or kill her. She replied that she knew people as well.
 {¶ 7} The victim then ran up the stairs to a bathroom where she quickly repaired her disheveled appearance before going to her next class. Once at the class, for which she was ten to fifteen minutes late, she asked another student to get the teacher, Ms. Steele, while she waited outside. Ms. Steele testified that the victim had looked sad and that she had begun to cry as she had related the incident. She further testified that it had been unusual behavior for the victim to stand outside the doorway to the classroom rather than come in and sit down. The victim told Ms. Steele that Nooks had put his hand into her pants. Ms. Steele then called the school nurse, Ms. Senne, and they agreed that the victim should go to the school's clinic. Ms. Steele turned the victim over to another teacher part of the way to the clinic, telling him only that she needed to go to the clinic.
 {¶ 8} When she arrived at the clinic, the victim spoke to Ms. Senne about the incident. Ms. Senne testified that the victim had a "blank look" on her face or seemed depressed and sick looking and that she had started to cry and had become visibly upset as she had related the incident to Ms. Senne. The victim was reluctant to talk, so Ms. Senne questioned her regarding what had happened. The victim related the above facts to Ms. Senne, also stating that Nooks had put his hands under her shirt. Ms. Senne took the victim to a conference room and had her write out a statement, then stayed with her until her mother arrived.
 {¶ 9} After leaving the victim with another teacher, Ms. Steele informed a school security guard, James Runyon, of the incident. Mr. Runyon went to the clinic but left when the victim was reluctant to speak in front of him. He then informed the principal, Ms. Frederick, of the incident. When they learned that the alleged assailant was Nooks, both Mr. Runyon and Ms. Frederick began searching for Nooks but could not find him. At approximately 11:20 a.m., Mr. Runyon was radioed that Nooks had arrived at the school's office. At that time, Mr. Runyon, at Ms. Frederick's instruction, took written statements from Ms. Steele, Ms. Senne, and Nooks. He also asked the school dispatcher to call the police. When Officer Jeffrey Lour arrived, Mr. Runyon gave him all the statements he had collected.
 {¶ 10} Officer Lour spoke to both Nooks and the victim. Nooks admitted that he had kissed the victim but denied trapping her and putting his hands into her pants. Officer Lour decided to arrest Nooks and took him to the Family Court Center. Nooks was originally charged with gross sexual imposition; however, the charge was amended to rape. An adjudicatory hearing was held on March 14, 2002, following which the trial court found Nooks to be a delinquent child. The judge issued findings of fact and conclusions of law on April 29, 2002. At the disposition hearing held on May 6, 2002, the trial court remanded Nooks to the custody of the Department of Youth Services for a minimum period of one year and a maximum period not to exceed his attainment of twenty-one years of age. The court declined to classify Nooks as a juvenile sex offender registrant at that time.
 {¶ 11} Nooks raises four assignments of error.
 "I. APPELLANT WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL DUE TO THE UNWARRANTED ADMISSION OF HEARSAY TESTIMONY." {¶ 12} Under this assignment of error, Nooks argues that the trial court erred in permitting the hearsay testimony of Ms. Steele and Ms. Senne. The state argues, and the trial court concluded, that the testimony was admissible under the excited utterance exception to the hearsay rule.
 {¶ 13} An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). The rationale for admitting such statements is that the declarant is unable due to the startling event to reflect on the statement sufficiently to fabricate it. See State v. Wallace (1988),37 Ohio St.3d 87, 88, 524 N.E.2d 466. Such statements are admissible if the following four criteria are met:
 {¶ 14} "(a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective,
 {¶ 15} "(b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,
 {¶ 16} "(c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and
 {¶ 17} "(d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration."Wallace, supra, at 89, citing Potter v. Baker (1955), 162 Ohio St. 488,124 N.E.2d 140, paragraph two of the syllabus; In re Michael (1997),119 Ohio App.3d 112, 128, 694 N.E.2d 538.
 {¶ 18} Nooks' argument relates to the second of these criteria. He argues that the victim was not still under the stress of the incident and that she had had time to reflect upon her statements before making them. In reviewing a trial court's decision whether to admit testimony under the excited utterance exception to the hearsay rule, "[w]e must give a great deal of deference to the trial court's determination of whether a declarant is still under the influence of an exciting event when the statements are made." Michael, supra, at 131, citing State v. Duncan
(1978), 53 Ohio St.2d 215, 219-20, 373 N.E.2d 1234.
 {¶ 19} In arguing that the victim was not under the stress of the incident at the time she made her statements to Ms. Steele, Nooks points to the fact that her testimony indicated that she had gone to the restroom to repair her appearance prior to recounting the details of what had happened to Ms. Steele. He further argues that her demeanor and the narrative she related to Ms. Steele are indicative of her being in possession of her mental faculties. The state asserts that the victim spent less than a minute in the restroom rebuttoning her pants and fixing her hair. When recounting the incident to Ms. Steele, she had tears in her eyes and appeared sad. Based upon these facts, the trial court concluded that the victim was still under the stress of excitement from the incident. We do not believe that the trial court abused its discretion in so concluding.
 {¶ 20} With respect to the statements the victim made to Ms. Senne, Nooks argues that she had already recounted the incident once to Ms. Steele, that she had had more time to reflect upon her story, and, again, that she was able to provide a coherent narrative of events. We do not believe that any of these facts indicate that the trial court abused its discretion in concluding that the victim was still under the stress of excitement from the incident at the time that she spoke to Ms. Senne. Ms. Senne's testimony regarding the victim's demeanor was sufficient to support the trial court's conclusion. However, Nooks also argues that Ms. Senne questioned the victim during her narrative, asking in particular whether Nooks had put his fingers inside her, to which she responded that he had. Nooks argues that Ms. Senne's questions to the victim render her testimony inadmissible.
 {¶ 21} Questioning does not preclude the admission of a declaration as an excited utterance where the questioning: "(1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties." Wallace, supra, at 93. Nooks' argument centers primarily upon the first requirement; he argues that Ms. Senne's questions, particularly the question regarding whether Nooks put his fingers in the victim's vagina, were leading. However, in Wallace, the supreme court cited with approval cases with similar types of questions. Id. at 92, citing State v. Dickerson (1977), 51 Ohio App.2d 255,367 N.E.2d 927 (admitting an affirmative answer to the question, "Did he shoot you, man?"); id. at 92, fn. 6, citing Bergfeld v. New York, Chicago St. Louis RR Co. (1957), 103 Ohio App. 87, 144 N.E.2d 483
(admitting declarations made in response to the question whether "that car we kicked back on number 1 hit you?"). Furthermore, Ms. Senne's questioning was, by her testimony, designed to facilitate the victim's recounting of events rather than cause her to reflect, and it is clear from Ms. Senne's testimony that the victim was under considerable stress throughout the questioning. Accordingly, it was reasonable for the trial court to conclude that, despite Ms. Senne's questioning, the victim was still under the effect of the stress from the incident at the time that she made statements to Ms. Senne.
 {¶ 22} For the foregoing reasons, we conclude that the trial court did not abuse its discretion in admitting Ms. Steele's and Ms. Senne's testimony regarding the victim's statements under the excited utterance exception to the hearsay rule.
 {¶ 23} The first assignment of error is overruled.
 "II. APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE." {¶ 24} When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997), 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." Id. at 175.
 {¶ 25} Under this assignment of error, Nooks asserts several reasons why he argues that the trial court's decision was against the manifest weight of the evidence. Many of his arguments are attacks upon the victim's credibility or attempts to twist her story to create inconsistencies where they do not exist. For example, he argues that the victim testified that the incident had occurred over a period of a half hour, which would not have been possible given the time that she left her wood shop class and the time that she appeared at her math class. However, a review of the testimony in question reveals that the victim only gave a time period when pressed to do so by the defense counsel and that she originally said that it had probably been fifteen minutes or a half an hour. This testimony does not indicate a lack of truthfulness on the part of the victim. In any case, credibility determinations are for the trial court, and the court explicitly stated that it credited the victim's testimony.
 {¶ 26} Nooks argues that the testimony of another student, who saw Nooks and the victim on the stairwell, indicates that Nooks did nothing more than put his arms around the victim. However, Nooks mischaracterizes the student's testimony. The student testified that Nooks had had the victim "sort of trapped" and that the victim had said, "Stop. Leave me alone." He indicated that Nooks had had his arms on the stair railing on either side of the victim. This testimony corroborates that of the victim rather than impeaches it. Nooks also appears to rely upon the student's testimony that he "didn't think anything of" what he had seen and that he did not think he needed to intervene. However, the student's interpretation of what he saw is irrelevant to what actually happened. The student obviously came upon Nooks and the victim when they were still on the stairs, before the attack had escalated to the point of Nooks putting his hand in the victim's pants. The fact that the student only saw the beginning of the attack does not establish that the subsequent events did not occur as the victim testified.
 {¶ 27} Next, Nooks argues that "a certain degree of levity prevailed" because the victim told him to "stop playing" and because she testified that he had been giggling during the attack. We agree with the state that Nooks was apparently the only person to find this incident funny. In any case, his levity and the victim's choice of words in no way negate her testimony regarding the event.
 {¶ 28} Nooks points to the fact that no one heard the victim despite the fact that she testified she had been yelling. In particular, Nooks argues that the wood shop teacher, Mr. White, would have heard her either while in his room or when he came out into the hallway to go to the cafeteria. Mr. White testified that he did not see or hear anything unusual that day. However, the victim testified that she had not been yelling during the entire incident and that she had not actually yelled for help because she had not wanted to be embarrassed by people coming into the hallway and seeing her. Mr. White testified that he would not have heard any noise while other students had still been in the hallway, that he had not gone over to the stairs, and that he had only been in the hallway for about thirty seconds. Therefore, it is possible that Mr. White simply was not in a position to hear the victim at the time that she was yelling. The trial court heard this evidence and determined that the victim was telling the truth.
 {¶ 29} Finally, Nooks argues that the police did a poor job of investigating the case, failing to interview the witnesses and refusing to take fingernail scrapings of Nooks. With regard to witness statements, Mr. Runyon took statements from the witnesses and gave those statements to the police when they arrived. Nooks does not explain how a second interview by police would have helped him. He has no basis for indicating that their statements would have changed, and he had an opportunity to question the witnesses regarding their recollections at trial. With regard to the fingernail scrapings, several hours had passed following the incident before Nooks requested the procedure. He had had ample opportunity to wash his hands and destroy any evidence. Therefore, the absence of evidence under his fingernails would not have been reliable evidence of his innocence. In any case, none of the alleged failings of the police department impact the pivotal evidence of this case, the victim's testimony.
 {¶ 30} We conclude that the trial court's decision was not against the manifest weight of the evidence.
 {¶ 31} The second assignment of error is overruled.
 "III. PROVISIONS OF SENATE BILL 3 ARE UNCONSTITUTIONAL AS APPLIED TO APPELLANT." {¶ 32} Under this assignment of error, Nooks argues that provisions of Senate Bill 3, the Juvenile Sex Offender Registration and Notification Law, are unconstitutional as applied to him because the law deprives juveniles of a jury trial and therefore deprives them of the constitutional guarantees to which adult defendants are entitled. However, the law was not applied to Nooks. The trial court declined to classify Nooks before he was remanded to the custody of the Department of Youth Services. Therefore, Nooks lacks standing to challenge the constitutionality of the law. In any case, Nooks' argument that adults are entitled to a jury trial in sexual offender designations and children are not is faulty. Several courts, including this one, have concluded that there is no right to a jury trial for sexual offender designations in cases involving adults. See State v. Ogden (Sept. 25, 2000), Montgomery App. No. 18110; State v. Petersime (July 28, 2000), Trumbell App. No. 99-T-0159. For the same reasons, there would be no such right for a juvenile.
 {¶ 33} The third assignment of error is overruled.
 "IV. APPELLANT'S SENTENCE IS EXCESSIVELY HARSH AND DISPROPORTIONATE IN CONSIDERATION OF THE PREVAILING FACTS AND CIRCUMSTANCES." {¶ 34} Under this assignment of error, Nooks argues that the trial court erred in committing him to the Department of Youth Services. He contends that he should have been placed on probation.
 {¶ 35} R.C. 2152.16(A)(1)(c) provides that a trial court may commit a juvenile offender to the Department of Youth Services for a minimum period of one to three years and a maximum term not to exceed the juvenile's attainment of twenty-one years of age for violations of R.C.2907.02. Thus, the trial court's sentence was within the statutory guidelines. Based upon the facts of this case, we do not believe that the trial court abused its discretion in committing Nooks to the Department of Youth Services rather than placing him on probation.
 {¶ 36} The fourth assignment of error is overruled.
 {¶ 37} The judgment of the trial court will be affirmed.
FAIN, J. and GRADY, J., concur.